1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MATTHEW HUBBARD,

               Plaintiff,

    v.

CARLOS DEL TORO,

               Defendant.

Case No. 3:22-cv-05357-TMC

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT

## I.    INTRODUCTION

Before the Court is Plaintiff Matthew Hubbard and Defendant Carlos Del Toro's ("the Navy") motions for summary judgment. Dkt. 15, 16. Hubbard is a Marine veteran suffering from PTSD who worked as a Materials Expeditor with the U.S. Navy in Bangor, Washington. Hubbard claims that after his supervisor found out about his condition, he was treated differently and eventually fired. He contends the Navy refused to allow him to take leave on the anniversary of the incident that caused his condition, created a hostile environment for him at work, and eventually terminated him because of his disability and his leave request. Both parties have filed motions for summary judgment; the Navy seeks dismissal of all of Hubbard's claims and Hubbard seeks dismissal of four of the Navy's affirmative defenses. For the reasons explained below, both motions are granted in part and denied in part.

## II.    BACKGROUND[1]

From November 2019 until March 16, 2021, Hubbard worked as a Materials Expeditor at the Puget Sound Naval Shipyard and Intermediate Facility ("PSNS & IMF"), Trident Refit Facility ("TRF"), in Bangor, Washington, whose "mission" is to "support planning and execution for the maintenance, modernization, and repair of Pacific Fleet Ballistic Missile Submarines." Dkt. 22 at 4, 15; Dkt. 18-3 at 2.[2] Generally, the responsibilities of the position were to "route parts, assemblies, and other material . . . into or out of TRF Repair Department shops . . . and TRF Weapons Repair Department," "expedite the movement of priority items & submarine repair material and follow up on overdue material, keeping production controllers, shop planners, and work area supervisor informed of material status," and tasks "involved in the industrial support of the submarines undergoing repairs, maintenance, overhaul, and modernization." *Id.* at 3. The position required that he be "physically able to perform the duties of continuous movement around and about [TRF]." *Id.* at 5. Hubbard also served rotations as an "attendant" for the facility's "Pre-Expended Bins" ("PEBs"), which supplied materials for the facility. *See* Dkt. 17 ¶¶ 3, 5.[3] PEB attendants were responsible for checking supply "throughout the day and putting that information into a spreadsheet," which would indicate what needed to be ordered. *See id.* ¶ 3.

---

[1] This recitation of the facts is based on the evidence in the record construed in the light most favorable to the respective non-moving party, as required on summary judgment.

[2] Hubbard first began working at TRF in April 2019 as a Tool and Parts Attendant. *See* Dkt. 1 ¶ 4.4; Dkt. 18-7 at 6. According to the complaint, the Navy "promoted" Hubbard to Materials Expeditor in November 2019, although Hubbard stated at his deposition that "[i]t was the same job," and the Navy had "basically just retitled [the] position." Dkt. 1 ¶ 4.5; Dkt. 18-7 at 7.

[3] Only one person served as the PEB attendant at any given time. *See* Dkt. 17 ¶ 3.

Hubbard is a veteran of the U.S. Marine Corps[4] who suffers from Post-Traumatic Stress Disorder ("PTSD") and depression[5] resulting from the death of a fellow soldier during his service. Dkt. 22 at 6, 9. His conditions cause the following symptoms:

- Difficulty in adapting to work;
- Difficulty in adapting to work-like settings;
- Difficulty in adapting to stressful circumstances;
- Disturbances of motivation and mood;
- Flattened affect;
- Difficulty in establishing and maintaining effective work and social relationships;
- Chronic sleep impairment;
- Anxiety;
- Depressed mood; and
- Occupational impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational task[s].

Dkt. 22 at 6. The anniversary of his friend's death, February 19th to 22nd, "is the worst three days of the year" for him. *Id.* at 8.

At 4:18 AM on the morning of Friday, February 19, 2021—prior to his start time of 5:00 AM—he called into work and left a voicemail on his "direct supervisor" Brenda Smith's phone line telling her that he "needed a mental health day." *See* Dkt. 18-7 at 9; Dkt. 22 at 5, 11, 30; Dkt. 18-7 at 8. Hubbard had been "up the entire night before unable to sleep," *id.* at 10, and was experiencing especially severe symptoms of his PTSD, *see id.* at 8 (noting that "most years I do fine, but this year was extremely hard").

Hubbard stayed home that day and returned to work the following Monday, February 22, 2021. *See* Dkt. 22 at 12. Upon returning, he dropped off a "Request for Leave or Approved Absence" form with Smith requesting accrued sick leave for February 19th; Hubbard again

---

[4] Hubbard was on active duty from 2003–2011. Dkt. 22 at 9.

[5] Hubbard was diagnosed with these conditions in 2014. *See* Dkt. 22 at 6.

indicated on the form that the reason for his absence was "personal reasons (mental health day)." *Id.* at 62. After dropping off the form, Smith walked over to Hubbard and "started telling [him] that 'when she has so many people already on the books for leave and I call out for things like that . . . ,'" at which point Hubbard interrupted her and said: "if you're going where I think you're going [you're] really going to piss me off." *See id.* at 12. Then, according to Hubbard:

> Ms. Smith continued to press how much I inconvenienced the shop. At this point the emotions I had spent the last three days working though overwhelmed me and I stated in a very loud voice to Ms. Smith[:] "You don't know shit about anything anyone in this shop is going through[.]" Ms. Smith stated that the conversation was over and left the workspace.

*Id.* at 12–13. Hubbard testified during his deposition that Smith raised the "volume of her voice" during the argument and that her tone was "very abrasive." Dkt. 18-7 at 19.

After the argument, Hubbard was "overwhelmed with emotion." Dkt. 22 at 13. On the advice of his work lead, he wrote an email that day to a superior, Alan Millermon, to inform him of the incident, express concern over Smith's treatment of him, and explain that taking the day off was disability related. *See id.* at 64. He stated that Smith "approaching [Hubbard] the way she did . . . [felt] like a direct attack" and that he wanted to inform Millermon of the incident "so I can have this on record." *Id.* He noted further that "without getting into detail this issue[] is directly connected to my 30% + rating with the VA." *Id.*

Smith also sought advice from Millermon on how to deal with Hubbard's behavior during the argument. Millermon suggested that Smith "counsel him." *Id.* at 53. The same day as the incident, Smith wrote a "warning letter" to Hubbard informing him that his "disrespectful behavior" during the argument had violated TRF's "Command Policy." *Id.* at 66. Smith considered this letter to be "informal discipline," meaning that it was not "documented" and amounted to a warning. *See id.* at 46–47. The letter told Hubbard that he was "to remain professional at all times" and stated that if he "disrespect[ed] anyone" in the future he would "be

subject to additional disciplinary action." *Id.* The next day, Millermon forwarded Hubbard's

email to him complaining about Smith's behavior during the argument to Smith. *Id.* at 64.

On February 24, Hubbard met with Smith and his foreman, Dustin Tweten, regarding the

incident. Dkt. 18-7 at 23–24; Dkt. 22 at 3. During the meeting, Hubbard explained that his

"raising [his] voice" during his argument with Smith was a "symptom" of his PTSD. Dkt. 22 at

16.[6] He also told them that his PTSD was the reason he called out on February 19th. Dkt. 18-7 at

24–25. There was no discussion of additional disciplinary actions during the meeting, and

Hubbard "felt like [they] were moving on." Dkt. 22 at 22.

However, on February 25, Smith asked Dawn Wilkie, a Human Resources Specialist, *id.*

at 72, if she could terminate Hubbard for "misconduct and performance." *See id.* at 86. And

according to Tweten, during discussions with Smith about "address[ing] [Hubbard's] conduct

and performance issues," he asked her if Hubbard "would be considered amenable to training

and/or other policy . . . , and she said no and recommended that she would prefer he would be

terminated." *Id.* at 72.

On the morning of March 2, 2021, Hubbard learned that Smith had charged him as

"AWOL" on the 19th and did not grant his leave request. *See id.* at 10 (noting that Hubbard had

"sent an email to Ms. Smith roughly around 7:40am that same morning asking about the charge

and how to correct it"). Smith did not reply to his email. *Id.* Later that day, Hubbard went to

Smith's office but she "stated that she was too busy to talk about it." *Id.* Because he was not

getting an answer from Smith, the next day he asked Tweten about how he could use his accrued

---

[6] When asked during his deposition whether he told Smith and Tweten that he was "going
through a PTSD episode at the time [he] raised [his] voice at" Smith, Hubbard responded that he
could not "recall if [he] did or not." Dkt. 18-7 at 26. As explained later in this order, viewing the
evidence in the light most favorable to Hubbard, the Court assumes that the statement in his 2021
declaration is true, even if he could no longer recall the statement in his deposition three years
later.

leave to cover the day off; Tweten told him he would discuss the issue with Smith. *Id.* at 16. Later that day, Smith asked to see Hubbard and informed him she was not going to change the AWOL designation and that his "only option was to go to the union." *Id.* at 10–11. At that point, Smith "stopped talking to [Hubbard] at all." *Id.* at 16.

The same day, at 11:34 a.m., Bissell forwarded Smith an email sent to her at 11:19 a.m. informing Bissell of an "uptick in PEB reversals[] lately"; During a rotation as PEB attendant "[i]n the early part of 2021," the person responsible for ordering materials for the PEB, Maureen Bissell, "discovered that Hubbard wasn't completing the spreadsheet entries," which "in turn created shortages in supply in the PEB, and increased the number of reversals that needed to be done." *Id.* ¶¶ 2, 5.  Bissell's message to Smith noted that the uptick resulted from Hubbard not "ordering what needed to get ordered" at PEB. *See* Dkt. 17-1 at 2. Hubbard acknowledges that he "was passing along uncompleted tasks for PEB to the next shift" but explained at his deposition that he did so because of his "limitations" and because he was "taken out [of] PEB 31.25 percent of the time" to check employees' temperatures when they arrived for work. *See* Dkt. 18-7 at 35–36. Hubbard also stated at his deposition that it was not his "responsibility alone," but rather was a "joint effort" to stock the PEB. *Id.* at 34.

On March 16, Smith asked Hubbard to come to her office and presented him with a termination letter. Dkt. 22 at 18. The letter listed as the reasons for his termination "us[ing] intimidating and abusive language" and "caus[ing] shortages and possible work stoppages by not performing your duties as a Material Expedit[o]r," explaining that during the preceding "few months," Hubbard "did not order supplies which caused supply shortages and a potential for work stoppage." *Id.* at 93.

After his termination, Hubbard began "looking for a job immediately," applying for "any job opening that [he] could find that was potentially in the same general pay scale as [he] had

been in when working for the Navy. [He] applied for jobs with the Federal Government, the County, the State, and for jobs in the private sector." Dkt. 15-1 ¶ 3.[7] He went to many "job fairs," where he would apply for jobs he thought he "might be qualified for" and that had "salary range[s]" that were "generally equivalent" to his position at the Navy. *Id.* ¶ 7. He "also applied for and received unemployment benefits." *Id.* ¶ 4.

Hubbard remembers two jobs he interviewed for during this time—one with the federal government and the other with "the State"—that he did not get. *Id.* ¶ 7. In 2022, Hubbard received a job offer for a "federal position"—the name of which he cannot remember—"at the [Navy's] Manchester [F]uel [D]epot," but the job offer was rescinded because he failed a urine analysis test (which tested positive for THC) and because he "did not have a [c]ommercial [d]river['s] license." *Id.* ¶ 8; Dkt. 20-2 at 11. That job would have provided him with "[retirement] credit" for his "eight years of military service." Dkt. 20-2 at 11; *see id.* at 9. Hubbard testified that his last marijuana use was four-and-a-half to five months before he took the urinalysis test. *See id.* at 12.

Hubbard eventually was hired as a "correctional/custody officer" with the Mission Creek Correctional Center for Women in Belfair, Washington, which he began on August 8, 2022. Dkt. 15-1 ¶ 9. He passed a urine analysis test during the hiring process. Dkt. 20-2 at 12. His current salary is "$8.50 per hour less than what [he] would have been making had [he] not been terminated by the Navy[] [a]ccording to the calculations that we did in response to the Navy's interrogatories." Dkt. 15-1 ¶ 10. However, the benefits he receives are "on par" with those he had with the Navy. Dkt. 20-2 at 4.

---

[7] Hubbard stated during his deposition that up until September 2021, he only applied to federal jobs so he could "maintain [his] time served." Dkt. 20-2 at 9.

1

2

3          Hubbard filed this case on May 19, 2022, raising claims under the Rehabilitation Act of

4   1973 for wrongful denial of a reasonable accommodation, hostile work environment, retaliation,

5   and disparate treatment. On April 18, 2024, Hubbard moved for summary judgment on the

6   Navy's affirmative defenses of lack of subject matter jurisdiction, failure to mitigate damages,

7   unavailability of punitive damages, and failure to exhaust administrative remedies. Dkt. 15. On

8   April 19, 2024, the Navy moved for summary judgment on all of Hubbard's claims. Dkt. 16.

9   Both motions are fully briefed and ripe for the Court's determination.

### III.   DISCUSSION

#### A.   Legal Standards

        "The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281

F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)).

        The moving party may fulfill its initial burden of production by "'showing'—that is,

pointing out to the district court—that there is an absence of evidence to support the nonmoving

party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), or by producing "evidence

negating an essential element of the nonmoving party's claim." *Nissan Fire & Marine Ins. Co.,*

*Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets its

initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts

showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. To do so, they must

present "some 'significant probative evidence tending to support the complaint.'" *Gen. Bus. Sys.*

*v. N. Am. Philips Corp.*, 699 F.2d 965, 971 (9th Cir. 1983) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)). To carry their ultimate burden of persuasion, the movant "must persuade the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102. The movant is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof at trial. *Celotex*, 477 U.S. at 323.

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Therefore, in ruling on a motion for summary judgment, "a District Court must resolve any factual issues of controversy in favor of the non-moving party," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (internal quotations omitted), and view the evidence in the light most favorable to it, *Anderson*, 477 U.S. at 255. But conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be presumed. *See Lujan*, 497 U.S. at 889. The evidence relied upon by the nonmoving party must be able to be "presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2).

**B.     Analysis**

      *1.     Defendant's Motion for Summary Judgment*

          *a.   Failure to Accommodate*

The Navy moves for summary judgment on Hubbard's reasonable accommodation claim, for which Hubbard argues that his leave request for February 19th was a request for a reasonable accommodation.

"The standards used to determine whether an act of discrimination violated the Rehabilitation Act are the same standards applied under the Americans with Disabilities Act ('ADA')." *Coons v. Sec'y of the U.S. Dep't of the Treasury*, 383 F.3d 879, 884 (9th Cir. 2004).

The failure to provide a reasonable accommodation is an act of discrimination if (1) the employee is a "qualified individual," (2) the employer receives adequate notice, and (3) a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business. *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) (internal quotation marks omitted).

Federal regulations define reasonable accommodations, in relevant part, as:

Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position.

29 C.F.R. pt. 1630 app. §1630.2(o); *see also Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 542 (7th Cir. 1995) ("It is plain enough what 'accommodation' means. The employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work."). Generally, "[u]npaid medical leave may be a reasonable accommodation under the ADA." *Dark v. Curry Cnty.*, 451 F.3d 1078, 1090 (9th Cir. 2006); s*ee* 29 C.F.R. Part 1630, App. (reasonable accommodations may include "permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment"). However, reasonable accommodations are "always prospective." *Alamillo v. BNSF Ry. Co.*, 869 F.3d 916, 922 (9th Cir. 2017) (quoting EEOC, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (EEOC ADA Enforcement Guidance), available at 2002 WL 31994335, at *25).

Hubbard's request for accommodation was for accrued leave to be applied to a day of work he missed *before* his request was made; he did not ask for prospective leave. Granting this request would not have required the Navy to change "its ordinary work rules, facilities, terms, and conditions in order to enable [Hubbard] to work." *Vande Zande*, 44 F.3d at 542. Because

1    Hubbard did not request a valid "accommodation," summary judgment on his failure to

2    accommodate claim is appropriate. *See Chandler v. DeJoy*, No. CV-20-00924-PHX-DWL, 2024

3    WL 359469, at *14 (D. Ariz. Jan. 31, 2024) (finding that the plaintiff's requested

4    accommodation for "excusing his past unscheduled absences and/or treating them as approved

5    absences" was a "non-starter because it is retrospective"). Instead, as discussed further below,

6    the Navy's failure to approve Hubbard's use of accrued leave for symptoms of PTSD is better

7    characterized as a disparate treatment claim.

8                    b.  *Disparate Treatment – Wrongful Termination*[8]

9           Hubbard argues that, because his outburst towards Smith resulted from his disability, the

10   Navy's decision to fire him was discriminatory because, "with few exceptions, conduct resulting

11   from a disability is considered to be part of the disability, rather than a separate basis for

12   termination." *Dark*, 451 F.3d at 1084.

13          "To prevail on a claim of unlawful discharge under the ADA, the plaintiff must establish

14   that he is a qualified individual with a disability and that the employer terminated him because of

15   his disability." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1133 (9th Cir. 2001). The

16   Navy argues that Hubbard's claim fails because he does not provide sufficient evidence

17   "linking" his conduct during the argument with Smith to his PTSD. Dkt. 16 at 11–12; Dkt. 24 at

18   5. But the cases the Navy cites to support its argument are distinguishable. In those cases, the

19   plaintiffs' evidence purporting to show that their disabilities caused the conduct for which they

20   were fired was too tenuous to create a genuine dispute of fact. *See Alamillo*, 869 F.3d at 921

21

22   _____

     [8] Hubbard's brings two disparate treatment claims listed as two separate causes of action. *See*
23   Dkt. 1 ¶¶ 6.1–6.12; *id.* ¶¶ 7.5, 7.7. The first alleges that the Navy discriminated against him
     because of his disability by terminating him for a symptom of his disability. *Id.* ¶ 6.10. The other
     asserts discrimination for Smith "berat[ing]" Hubbard for taking a day off and marking him as
24   AWOL. *Id.* ¶ 7.5. The Court deals with each claim separately.

(holding that the plaintiff's physician's statement that the conduct leading to the firing was "within the array of symptoms" of the plaintiff's disability was not sufficient to show "direct causation"); *Adams v. County of Maricopa*, No. 20-17299, 2022 WL 42472, at *2 (9th Cir. Jan. 5, 2022) (finding that a psychiatrist's statement that her bipolar disorder was "consistent with . . . outbursts" was similarly inadequate to show causation between the condition and "fifteen years of misconduct" (citing *Alamillo*, 869 F.3d at 921)).

Hubbard's evidence, however, does draw a direct connection between his PTSD and one of the asserted grounds for his termination. Hubbard's outburst happened shortly after the anniversary of the combat trauma event that precipitated his PTSD. He states in his declaration that "the emotions [he] had spent the last three days working though overwhelmed [him]," which led to him cussing at Smith during their argument. *See* Dkt. 22 at 12–13. And two of his symptoms listed in his declaration specifically pertain to the conduct at issue: "[d]ifficulty in adapting to stressful circumstances," and "[d]isturbances of motivation and mood." *Id.* at 6. This evidence, viewed in the light most favorable to Hubbard, is sufficient to create a genuine dispute of fact as to whether his PTSD "directly" caused the outburst for which he was fired. *See Alamillo*, 869 F.3d at 921 (noting that, in another case, the plaintiff's performance evaluation "indicat[ing] that were it not for her ailment, she would have been a model employee" was sufficient to show that the punished conduct was "the direct result" of her condition (citing *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1132 (9th Cir. 2001)); *cf. Adams*, 2022 WL 42472, at *2 ("Although Ms. Adams claims she 'periodically acted out' because of her disabilities, she has not addressed any of the May 2003 to January 2018 Code of Conduct violations, much less explained how those behaviors resulted from her disability.").

The Navy next contends that it could not have discriminated against Hubbard because there is no evidence that the Navy knew his PTSD caused his conduct during the argument with

Smith. Dkt. 16 at 12. Rather, Hubbard stated during his deposition in 2024 that he could not recall whether, during his February 24th, 2021 meeting with Smith and Tweten, he told them that he was "going through a PTSD episode" when he "raised [his] voice at" Smith. *See* Dkt. 18-7 at 26. But Hubbard's declaration in the EEO investigation—given in June 2021, just months after the incident—explains that during the meeting, "[w]e discussed the incident. I apologized for raising my voice and explained that it was a symptom of my PTSD." Dkt. 22 at 16. Viewing the evidence in the light most favorable to Hubbard, the Court assumes that the statement in his 2021 declaration is true, even if he could no longer recall the statement in his deposition three years later. Any argument by the Navy that the inconsistency in these statements lessens Hubbard's credibility is for a jury, not the Court. *See Anderson*, 477 U.S. at 255.

The Navy also points to Hubbard's failure to complete spreadsheets during his PEB rotation as a legitimate, non-discriminatory reason for his firing. However, a plaintiff can show that an asserted non-discriminatory reason for an adverse action is pretextual by providing circumstantial or direct evidence of discrimination. *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1094–95 (9th Cir. 2005). "Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998). Because Hubbard has produced some direct evidence of discrimination, the Navy's motion for summary judgment on Hubbard's wrongful termination claim is denied. *See id.* (holding that even "very little" direct evidence of discriminatory motive is sufficient to create "a triable issue as to the actual motivation of the employer").

c.   *Disparate Treatment – "Berating" and AWOL Designation*

The Navy also argues that the Court should grant summary judgment for Hubbard's disparate treatment claim based on Smith "berating" him during the February 22nd argument and marking him as "AWOL" despite his request to use accrued leave on February 19th. It contends

that Smith yelling at Hubbard does not qualify as an "adverse action" and that "the Refit Facility had a legitimate, non-discriminatory reason for marking him AWOL" because he "did not give a valid reason for using sick leave." Dkt. 16 at 16–17 (quoting Smith's deposition testimony that "[i]n order to approve leave, I have to know what they're being excused for. He wasn't telling me anything. Having a bad day is not a justifiable reason for being out. If he said he had a cold or wasn't feeling well, that would have been a different story").

First, the Court agrees with the Navy that Hubbard cannot bring a disparate treatment claim for Smith "berating" him. "To show a prima facie case of disparate treatment under the Rehabilitation Act, [Hubbard] must show that, within the meaning of the statute, [he]: '(1) is disabled; (2) is qualified; and (3) suffered an adverse employment action because of h[is] disability.'" *Williams v. Spencer*, No. C16-5945 BHS, 2018 WL 5112641, at *5 (W.D. Wash. Oct. 19, 2018) (quoting *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001)), *aff'd sub nom*, *Williams v. Modly*, 796 F. App'x 378 (9th Cir. 2020). "[A]n adverse employment action is one that materially affect[s] the compensation, terms, conditions, or privileges of . . . employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (internal quotation marks omitted); *see Jefferson v. Time Warner Cable Enters. LLC*, 584 F. App'x 520, 522 (9th Cir. 2014) (applying the rule from *Davis* to an ADA disparate treatment claim). Hubbard describes in his declaration that Smith raised the "volume of her voice" during their argument on the 22nd and that her tone was "very abrasive." Dkt. 18-7 at 19. The Court agrees with others that have found that "[y]elling at or otherwise using a harsh tone towards an employee is not an adverse employment action for the purposes of a discrimination claim." *Peña v. Clark Cnty.*, No. 21-5411-DGE, 2023 WL 3160157, at *11 (W.D. Wash. Apr. 28, 2023) (quoting *Tavares v. ASARCO LLC*, No. 20-1596-SPL, 2022 WL 1811166, at *3 (D. Ariz. June 2,

1    2022)). The Court grants summary judgment as to Hubbard's disparate treatment claim for Smith

2    "berating" him.

3         In contrast, the Court concludes Hubbard has produced sufficient evidence to survive

4    summary judgment on his disparate treatment claim arising from the Navy marking him as

5    "AWOL" for his February 19th absence. A plaintiff bringing a discrimination claim under the

6    Rehabilitation Act must show that their disability was a "but for" cause of the allegedly

7    discriminatory action. *See Murray v. Mayo Clinic*, 934 F.3d 1101, 1105 (9th Cir. 2019); *Chand*

8    *v. Regan*, No. 21-cv-07773-RS, 2022 WL 2390996, at *3 (N.D. Cal. July 1, 2022) (applying

9    *Murray*'s holding to a disparate treatment claim brought under the Rehabilitation Act).

10   Generally, a plaintiff bringing a discrimination claim "may proceed by using the *McDonnell*

11   *Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence

12   demonstrating" discriminatory animus. *Hittle v. City of Stockton*, 101 F.4th 1000, 1012 (9th Cir.

13   2024). But "regardless of the approach a plaintiff takes . . . , once an employer articulates some

14   legitimate, nondiscriminatory reason for the challenged action, the employee must show that the

15   articulated reason is pretextual." *Id.* (internal quotation marks omitted).

16        As recognized above, "[a] plaintiff may meet the burden to show pretext using either

17   direct or circumstantial evidence." *Coghlan*, 413 F.3d at 1094–95. "Direct evidence is evidence

18   which, if believed, proves the fact of discriminatory animus without inference or presumption."

19   *Id.* at 1095 (cleaned up) (internal quotation marks omitted). And "[c]ircumstantial evidence . . . is

20   evidence that requires an additional inferential step to demonstrate discrimination." *Id.*

21   Circumstantial evidence can take two forms: (1) the plaintiff can make an affirmative case that

22   the employer is biased, or (2) he "can make his case negatively, by showing that the employer's

23   proffered explanation for the adverse action is unworthy of credence." *Id.* (internal quotation

24

marks omitted). To avoid summary judgment, circumstantial evidence must be "specific and substantial." *Hittle*, 101 F.4th at 1015.

"Proof that the defendant's explanation is unworthy of credence is [a] form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000). In fact, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148.

The Navy does not challenge whether Hubbard's evidence establishes a prima facie case, but rather proceeds to step two and argues that Smith had a "legitimate, non-discriminatory reason for marking [Hubbard] AWOL – both when he called in and when he turned in his leave slip, he did not give a valid reason for using sick leave." Dkt. 16 at 16–17. The Navy then cites to Smith's proffered rule for approving leave: "[I]n order to approve leave, I have to know what they're being excused for. He wasn't telling me anything. Having a bad day is not a justifiable reason for being out. If he said he had a cold or wasn't feeling well, that would have been a different story." *Id.* at 17 (quoting Dkt. 18-8 at 8).

But Smith's statement supports Hubbard's case, not the Navy's. According to Smith, excuses sharing the same degree of generality as Hubbard's (needing a "mental health day") that pertain to *non*-mental health issues (such as simply saying one is not "feeling well") would have been sufficient for her to grant a leave request and not mark the claimant as "AWOL." Both needing a "mental health day" and "[not] feeling well" unambiguously refer to health issues; the only difference between the two is that one specifically refers to *mental* health and the other does not. Viewed in the light most favorable to Hubbard, Smith's statement is direct evidence of discrimination.

Nor was this the only statement from Smith that suggests discriminatory animus. Hubbard states in his declaration that, after dropping off his form requesting leave—which reiterated that he was absent because he needed a "mental health day"—Smith chastised him for "call[ing] out for *things like that*." Dkt. 22 at 12 (emphasis added). Especially viewed in context with Smith's deposition testimony explaining why she did not give credence to his leave request, this evidence is also direct evidence of discriminatory animus; viewed in the light most favorable to Hubbard, the statement shows Smith was upset about the specific *reason* Hubbard used for his absence (as opposed to, for example, whether his leave request provided sufficient detail).[9]

Considering the low bar for showing pretext through direct evidence, *see Godwin*, 150 F.3d at 1221, Hubbard's two substantial examples of Smith's mindset with respect to his leave request are sufficient to show pretext and create a triable issue on his claim. The Navy's motion for summary judgment on Hubbard's disparate treatment claim relating to his AWOL designation is denied.

### d. Retaliation

As to Hubbard's retaliation claim, the Navy first argues that the claim is not adequately pled because "Hubbard [had] not raised any factual allegations [in his complaint] that the Refit Facility retaliated against him when it decided to remove him." Dkt. 24 at 6 (citing Dkt. 16 at 14

---

[9] The Navy also states that "Hubbard did not tell Smith that he needed to be out for PTSD," and "he only told the Refit Facility that he was taking the day off for personal reasons and that he needed a mental health day, which had no special meaning at the Refit Facility." Dkt. 16 at 17. To the extent the Navy is arguing that an employer can only discriminate against an employee if they know the employee's exact diagnosis, the Court rejects this contention. The Rehabilitation Act defines a disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). It follows that "an employer need not know the exact diagnosis to be liable for discrimination on the basis of a disability." *Glaser v. Gap Inc.*, 994 F. Supp. 2d 569, 578 (S.D.N.Y. 2014) (citing 42 U.S.C. § 12102(1)(C); 29 C.F.R. 1630.2(g)(3)&(ℓ)).

n.7). Therefore, the Navy argues, "the Court should not permit Hubbard to change his theory of the case at this stage in the litigation." *Id.* at 7. Whether a claim or legal theory asserted in a response to a motion for summary judgment is "new" "is determined by looking to Rule 8's 'liberal notice pleading' standard." *Raner v. Fun Pimps Ent. LLC*, 3:22-cv-05718-TMC, 2024 WL 1179140, at *4 (W.D. Wash. Mar. 19, 2024) (citing, inter alia, *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 969 (9th Cir. 2006)). And under Rule 8, the statement of the claim need only give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint is subject to dismissal under Rule 8 if "one cannot determine from the complaint who is being sued, for what relief, and on what theory." *McHenry v. Renne*, 84 F.3d 1172, 1178 (9th Cir. 1996). In making this determination, courts look to the substance of the allegations rather than the label the plaintiff provides in the complaint. *See Sessions v. Chrysler Corp.*, 517 F.2d 759, 760–61 (9th Cir. 1975) (explaining that mislabeling a cause of action in the complaint "is irrelevant" so long as the plaintiff is "entitled to relief against [defendants] on any theory"); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1286 (4th ed. 2023) ("A pleading will be judged by the quality of its substance rather than according to its form or label.").

While Hubbard could have presented his retaliation claim with greater clarity, the allegations in the complaint are sufficient to provide notice that Hubbard was bringing a retaliation claim. To establish a prima facie case of retaliation under the Rehabilitation Act, the plaintiff must show that (1) they engaged in protected activity, (2) they suffered an adverse employment action, and (3) that there is a causal connection between the protected activity and the adverse employment action. *See Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 849 (9th Cir. 2004) (setting out elements of an ADA retaliation claim); *Brooks v. Capistrano Unified Sch. Dist.*, 1 F. Supp. 3d 1029, 1035–36 (C.D. Cal. 2014) ("[T]he legal elements and the production

of proof for a retaliation claim under the Rehabilitation Act is the same as that used under the ADA."). As to the first element, Hubbard's allegations that he made a "report" to Millermon regarding his argument with Smith and explained his conduct to Smith and Tweten during their February 22nd meeting can be fairly construed as allegations of engaging in a protected activity. *See* Dkt. 1 ¶¶ 4.23–4.28. And in the allegations that immediately follow, Hubbard alleges adverse actions that occurred soon thereafter (denying Hubbard's multiple attempts to apply for leave for his February 19th absence). *See id.* ¶¶ 4.29–4.41. Hubbard also alleges in a different section of his complaint that his termination was "retaliatory." *Id.* ¶ 7.6. This same allegation speaks to causation: "the [Navy] . . . ratified and adopted the supervisor's conduct and discriminatory *and retaliatory* motives by terminating the Plaintiff at her request." *Id.* ¶ 7.6 (emphasis added). Although some of these allegations are made under headings for different causes of action, the Court must consider the substance of the allegations, not the complaint's form or labels.[10] Based on the above allegations, the Court finds that the complaint provides adequate notice of a retaliation claim and declines to dismiss the claim as inadequately pled.

Addressing the merits, the Navy first argues that the protected activities Hubbard identifies for the first prong of the prima facie test are not valid: "1) Mr. Hubbard opposing Ms. Smith's berating him for taking time off due to his disability;[11] 2) his reporting disability

---

[10] The Navy acknowledged in its opening brief that Hubbard may be bringing a retaliation claim, although this seemed to have only been based on "the title of his third cause of action." Dkt. 16 at 14 n.7.

[11] Hubbard's first asserted protected activity—"opposing" Smith's berating him—appears to refer to Hubbard telling Smith "if you're going where I think you're going you're really going to piss me off" and "[y]ou don't know shit about anything anyone in this shop is going through" in response to her chastising him for taking an absence for a "mental health day" during the February 22nd argument, *id.* at 12–13. *See* Dkt. 23 at 20 (noting that "the termination was based, in part, on Mr. Hubbard's opposition to Ms. Smith harassing him about his PTSD."); *id.* at 93 (listing Hubbard's use of "intimidating and abusive language towards" Smith and inadequate performance of duties as a PEB attendant as the two reasons for his termination).

harassment to his managers, and 3) Mr. Hubbard requesting a reasonable accommodation of being allowed to use accrued leave to cover the 8 hours he was unable to work due to PTSD." Dkt. 23 at 20.

"The same [Title VII] standards apply with respect to a retaliation claim based on the exercise of rights under the Rehabilitation Act." *Coons*, 383 F.3d at 887. "Title VII's anti-retaliation provision forbids employer actions that 'discriminate against' an employee because he has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing' or 'opposed' a practice that Title VII forbids." *Scott v. Mabus*, 618 F. App'x 897, 901 (9th Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 59–60 (2006)) (applying this rule to a retaliation claim brought under the Rehabilitation Act). Hubbard's first two asserted protected activities pertain to opposition to discrimination, not participation in an administrative case.

Generally, an "informal complaint" is a protected activity. *Ray v. Henderson*, 217 F.3d 1234, 1240 n.3 (9th Cir. 2000). But a plaintiff must show that they expressed opposition to an action of their employer "as discriminatory" and not merely "for personal reasons." *See Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1411–12 (9th Cir. 1987); *see also id.* ("[The plaintiff's] *statement* merely expressed his fear for his personal "success at KIIS" and his "numbers," not his concern about discrimination against him or other Hispanics." (emphasis added)); *Scott*, 618 F. App'x at 901 ("An employee who engages in a protected opposition activity must indicate that his opposition is on the basis of a protected ground." (citing *Jurado*, 813 F.2d at 1411–12)). While a plaintiff "must reasonably put his employer on notice that he is engaging in protected activity," *Scheitlin v. Freescale Semiconductor, Inc.*, No. CV–08–02342–PHX–FJM, 2010 WL 2232200, at *7 (D. Ariz. June 3, 2010), they "need not utter magic words," *Kitchen v. WSCO Petroleum Corp.*, 481 F. Supp. 2d 1136, 1145 (D. Or. 2007).

The Navy argues, as to Hubbard's first asserted protected ground, that neither of Hubbard's statements during the February 22nd argument that are referenced in his declaration are "indicative of his opposition 'on the basis of a protected ground.'" Dkt. 24 at 7 (citing *Scott*, 618 F. App'x at 901). The Court agrees; Hubbard's statements that "if you're going where I think you're going you['re] really going to piss me off" and "[y]ou don't know shit about anything anyone in this shop is going through" make no mention of perceived discrimination based on his disability (or Smith's perception of it). A factfinder could not reasonably infer that Hubbard's statements pertained to "a protected ground." The Navy's motion on this ground is granted.

The Navy makes a similar argument for Hubbard's second asserted protected activity. *See* Dkt. 24 at 8. But unlike his statements to Smith, Hubbard's email to his managers does give sufficient notice that he was engaging in a protected activity. The email notes both that he "needed to call out for a personal issue . . . [that] is directly connected to [his] 30%+ rating with the VA" and that Hubbard had told Smith that he took the day off because he "needed a 'mental health day.'" Dkt. 22 at 64. Hubbard then states that Smith criticized him for taking the day off and complains that Smith "approaching [him] the way she did it did feel like a direct attack on [his] action." *Id.* While not explicit, construing the email in the light most favorable to Hubbard and drawing reasonable inferences in his favor, a factfinder could conclude that the email indicated Hubbard's opposition to conduct that he felt was based on his disability.

The Court also agrees that Hubbard's third asserted ground, his request for leave, constitutes a protected activity. A request for a reasonable accommodation is generally considered to be protected "participation." *See LeBarron v. Interstate Grp., LLC*, 529 F. Supp. 3d 1163, 1173 (D. Nev. 2021) (a protected activity "includes opposing any act or practice by the employer that violates the ADA and pursuing rights guaranteed by the statute like requesting a

reasonable accommodation"). Although the Court previously ruled that Hubbard's request for leave was not reasonable because it was retrospective, the Rehabilitation Act prohibits retaliation even for unsuccessful but good faith attempts at requests for reasonable accommodation. *Cf. Coons*, 383 F.3d at 887 (noting, in deciding that the court would still consider the plaintiff's retaliation claim even though "he [was] not disabled under the Rehabilitation Act," that "the ADA prohibits an employer from retaliating against an employee who seeks an accommodation *in good faith*" (emphasis added)); *see also id.* ("Coons was engaged in a protected activity when he requested that the IRS make reasonable accommodations for his alleged disability."). Even though Hubbard's reasonable accommodation request failed, there is no evidence it was not made in good faith, especially given that requests to use accrued leave can be deemed requests for reasonable accommodation. *See Dark*, 451 F.3d at 1090 (noting that "a reasonable accommodation 'could include permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment'" (quoting 29 C.F.R. Part 1630, App.)). The Navy's motion on this ground is denied, and the Navy has not challenged the other elements of Hubbard's prima facie case.

The Navy also argues that, even if Hubbard can establish a prima facie case, he has not sufficiently shown that its asserted non-retaliatory reasons for his termination—his behavior during his argument with Smith and his inadequate performance during his PEB rotation—are pretextual. It is well established that "proximity in time between the protected action and the allegedly retaliatory employment decision [i]s one [way] a jury logically could infer [that the plaintiff] was terminated in retaliation," and, "[i]n some cases, temporal proximity can by itself constitute sufficient circumstantial evidence of retaliation for purposes of both the prima facie case and the showing of pretext." *Dawson v. Entek Int'l*, 630 F.3d 928, 937 (9th Cir. 2011) (finding that a two-day gap between the protected activity and the discharge supported a finding

that the plaintiff created a genuine dispute of fact as to pretext). This determination is made based on the date the employer learns of the protected activity. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's *knowledge* of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close' . . . ." (emphasis added)).

The Navy terminated Hubbard 22 days after Smith received Hubbard's request for leave and 21 days after she learned of his email to Millermon. This provides support for a finding of pretext. *See Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 870 (9th Cir. 1996) (temporal proximity in the form of "alleged acts of retaliation occur[ing] within months" after a protected activity supported a finding of pretext). And temporal proximity is not Hubbard's only evidence. Other high-ranking employees at TRF suggested that "counseling" could be a sufficient punishment for Hubbard, but Smith—whom he complained about—pushed for his termination. *See* Dkt. 22 at 53 (Millermon suggested "counseling" to deal with Hubbard's "aggressive and unprofessional behavior"); *id.* at 72 (Tweten asked Smith "after all these incidents" "what her preferred course of action would be, if he would be considered amendable to training and/or other policy from TRF Bangor, and she said no and recommended that she would prefer he would be terminated."). The record also suggests Smith changed course soon after learning of Hubbard's email to Millermon. While she initially wrote Hubbard an informal letter warning he could be subject to "additional disciplinary action" if he continued to act disrespectfully, within days of receiving a copy of the email, Smith asked an HR employee if she could terminate Hubbard for "misconduct and performance." *See id.* at 86. Taken together, Hubbard's circumstantial evidence is sufficiently "specific and substantial" to "create a triable issue" with respect to the Navy's retaliatory motive. *Godwin*, 150 F.3d at 1222. The Navy's

1   motion as to Hubbard's retaliation claim relating to his second and third protected activities is

2   denied.

3           e.  *Hostile Work Environment Claim*

4           The Navy also asks for summary judgment on Hubbard's hostile work environment

5   claim. Hubbard does not specifically oppose the Navy's motion with respect to this claim. While

6   the Court does not treat Hubbard's lack of response as an admission that the Navy's arguments

7   have merit, *see* LCR 7(b)(2), the Court agrees with the Navy and will grant summary judgment

8   for this claim.

9           To establish a hostile work environment, a plaintiff must show: (1) that he was subjected

10  to verbal or physical conduct related to a protected characteristic; (2) that the conduct was

11  unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions

12  of the plaintiff's employment and create an abusive work environment. *Vasquez v. County of Los*

13  *Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). "[T]he required showing of severity or seriousness

14  of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct."

15  *Mattioda v. Nelson*, 98 F.4th 1164, 1175–76 (9th Cir. 2024). "The conduct must be both

16  subjectively and objectively abusive." *Id.* at 1176. Thus, "isolated incidents (unless extremely

17  serious) are not sufficient to create an actionable claim." *Id.*

18          Based on the allegations in Hubbard's complaint, the evidence he provides that is

19  relevant to his hostile work environment claim is: Smith "berating" him for taking a "mental

20  health day" on February 19th, 2021, during which time Smith raised the "volume of her voice"

21  and had a "very abrasive" tone, Dkt. 18-7 at 19; marking him as "AWOL" for taking the day off,

22  Dkt. 22 at 10; and not talking to Hubbard "at all" beginning on March 3, *id.* at 16.[12]

23
24  ───────────────

[12] It is not clear from Hubbard's evidence how long Smith refused to talk to him for, but her
"silent treatment" ended by at least March 16, when she terminated him. *See* Dkt. 22 at 16.

Hubbard's evidence is comparable to cases where the Ninth Circuit has granted summary judgment on hostile work environment claims. *See Vasquez*, 349 F.3d at 642–44 (holding that "[t]wo isolated offensive remarks," "two instances" when his supervisor yelled at him, and two memos containing "false complaints" against the plaintiff were insufficient to create a genuine dispute of fact). The Navy's motion as to Hubbard's hostile work environment claim is granted.

2.      *Plaintiff's Motion for Partial Summary Judgment*

Hubbard's motion for partial summary judgment requests summary judgment on the Navy's affirmative defenses for: lack of subject matter jurisdiction, failure to mitigate damages, unavailability of punitive damages (which Hubbard has not sought), and failure to exhaust administrative remedies. In response, the Navy concedes that the Court has subject matter jurisdiction,[13] that Hubbard exhausted administrative remedies on his claims, and that the issue of punitive damages is moot if Hubbard is not seeking them. Dkt. 19 at 1 n.1. Given these concessions, the court grants Hubbard's motion as to these affirmative defenses and will only address mitigation.

"As a broad proposition, injured parties are expected to mitigate the damage they suffer." *Sangster v. United Air Lines, Inc.*, 633 F.2d 864, 867 (9th Cir. 1980). Because Hubbard seeks front pay damages, Dkt. 1 at 11, he has "a duty to mitigate damages by seeking alternative employment with 'reasonable diligence.'" *See Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1020 (9th Cir. 2000), *as amended on denial of reh'g* (Nov. 2, 2000) (noting that this requirement "has been used to constrain awards of front pay").[14] To prevail on the defense, the defendant has

---

[13] Because all of Hubbard's claims arise from federal statutes, the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

[14] The Rehabilitation Act incorporates Title VII's remedial procedures. *See McLean v. Runyon*, 222 F.3d 1150, 1155 (9th Cir. 2000) (citing 29 U.S.C. § 794a).

the burden of proving that "during the time in question there were substantially equivalent jobs available, which [the plaintiff] could have obtained, and that [the plaintiff] failed to use reasonable diligence in seeking one." *Odima v. Westin Tucson Hotel,* 53 F.3d 1484, 1495 (9th Cir. 1995). "'Substantially equivalent employment' is that which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the [ ] claimant has been discriminatorily terminated." *Brown v. Riverside Elementary Sch. Dist. No. 2*, No. CV-21-01569-PHX-DJH, 2024 WL 474528, at *5 (D. Ariz. Feb. 7, 2024) (internal quotation marks omitted); *see also Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982) ("[T]he unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position" in order to mitigate damages).[15]

The Navy provides sufficient evidence that the Manchester Fuel Depot job was "substantially equivalent" to his position at TRF to create a genuine dispute of fact. It points to Hubbard's statement during his deposition that he would have "received [retirement] credit for [his] eight years of military service" in the Fuel Depot job. *See* Dkt. 20-2 at 9, 11. And, construed in the light most favorable to the Navy and drawing reasonable inferences in its favor, Hubbard's declaration also establishes that, during the relevant period of time, he was applying for jobs "in the same general pay scale," and "within the salary range generally equivalent to" his job at TRF, which would have included the Fuel Depot position. *See id.* at 71–72. The Fuel

---

[15] "Although other circuit courts have held that a defendant need not prove the availability of substantially equivalent jobs if it can show that the employee failed to use reasonable diligence, the Ninth Circuit has not modified the general rule, which requires the defendant to show both elements." *Enriquez v. Gemini Motor Transp. LP*, No. CV-19-04759-PHX-GMS, 2021 WL 5908208, at *13 (D. Ariz. Dec. 14, 2021).

1   Depot job was also located in Manchester, Washington, Dkt. 20 ¶ 2, which is less than an hour

2   drive from the Bangor base.

3         In sum, the Navy's evidence that the Fuel Depot job had a similar salary, benefit credits,

4   location, and the same employer is sufficient to at least create a triable issue of fact on whether

5   the jobs were substantially equivalent. *Cf. EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 683 (9th Cir.

6   1997) (reversing district court's grant of defendant's motion for summary judgment on

7   mitigation because the evidence showed that the jobs available to the plaintiff that were "similar

8   in kind to . . . [his] former position had salaries lower than that of his old job" while others "were

9   substantially dissimilar to Waters' previous employment"); *Kawar v. JPMorgan Chase & Co.*,

10  No. CV–08–0046–PHX–DGC, 2009 WL 1698918, at *6 (D. Ariz. 2009) (granting plaintiff's

11  motion for summary judgment on the defendant's mitigation defense where the defendant

12  "provided no information regarding the [salary] nor whether these positions were comparable to"

13  the job the plaintiff claimed he was unlawfully denied).

14        The Navy must also provide sufficient evidence that Hubbard was not "reasonably

15  diligent" in his attempts to find comparable employment. "The reasonableness of a plaintiff's

16  efforts to mitigate is a question of fact for jury determination." *Jackson v. Shell Oil Co.*, 702 F.2d

17  197, 202 (9th Cir. 1983).

18        The Navy argues that Hubbard's failed drug test, which prevented him from attaining

19  comparable employment at the Fuel Depot, creates a genuine dispute of fact that he was

20  reasonably diligent; the Navy emphasizes that, according to Hubbard's deposition testimony that

21  he used marijuana four-and-a-half to five months before taking the UA test, Hubbard was using

22  the drug at least by September or October 2021, when he was applying to jobs with the federal

23  government. *See* Dkt. 20 ¶ 2. Hubbard does not address his failed drug test in his opening brief

24  and did not file a reply to the Navy's response.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT - 27

1    "A wrongfully discharged employee is required to make only a reasonable effort to

2    obtain interim employment, and is not held to the highest standard of diligence," and "[s]uccess

3    or failure in securing interim employment is not a measure of the sufficiency of the employee's

4    search; the law requires only an 'honest good faith effort.'" *Kawasaki Motors Mfg. Corp., U.S.A.*

5    *v. NLRB*, 850 F.2d 524, 527 (9th Cir. 1988); *see also Cassella v. Mineral Park, Inc.*, No. 08-

6    1196-MHM, 2010 WL 454992, at *7 (D. Ariz. Feb. 9, 2010) ("[T]he standard is reasonable, not

7    maximum, diligence."). In the context of the NLRB's backpay provision—which the Ninth

8    Circuit has found to be relevant to Title VII's backpay provision, *see Sangster v. United Air*

9    *Lines, Inc.*, 633 F.2d 864, 868 (9th Cir. 1980)—the Ninth Circuit has held that, "[b]ecause the

10   ultimate test of the employee's efforts is whether they are consistent with the inclination to work

11   and to be self-supporting, we approve the NLRB's policy of looking to the backpay period *as a*

12   *whole* and not at *isolated portions* of that period." *Kawasaki Motors*, 850 F.2d at 527 (emphasis

13   added).

14   Consistent with this principle, in applying Title VII's backpay mitigation rule, the

15   Northern District of California in *E.E.O.C. (U.S.A.) v. Pac. Press Publ'g Ass'n* did not consider

16   the plaintiff going "out of her way to volunteer information to potential employers such as her

17   exercise of her Title VII rights, her availability initially only for temporary work, and her

18   unwillingness to work on Friday evenings and on Saturdays,"—"which made her less than

19   attractive as a prospective full-time employee"—to mean that she failed to mitigate damages

20   because her other efforts were sufficient to show reasonable diligence: "defendant has provided

21   no evidence that would contradict Tobler's testimony about her efforts in checking want ads,

22   registering with employment agencies, and discussing employment openings with acquaintances

23   nor which would indicate additional opportunities Tobler might have pursued." 482 F. Supp.

24

1291, 1317 (N.D. Cal. 1979), *aff'd sub nom. E.E.O.C. v. Pac. Press Pub. Ass'n*, 676 F.2d 1272 (9th Cir. 1982).

While the Ninth Circuit does not appear to have specifically addressed whether violating a condition of prospective employment, despite being otherwise qualified for an equivalent position, means the plaintiff was not reasonably diligent in pursuing that job, the above principles suggest this issue is not appropriate for summary judgment. The reasonableness inquiry presents a question of fact that is "tailor[ed] . . . to the particular characteristics of the injured plaintiff." *Pape Lift, Inc.*, 115 F.3d at 683. The "substantially similar" jobs Hubbard was seeking, at least initially, were largely federal positions, because those would allow him to "maintain [his] time served." *See* Dkt. 20-2 at 8–9. A reasonable juror could find that Hubbard's marijuana use was not indicative of an "honest, good faith effort" when he was focusing on applying to federal jobs, as marijuana use is illegal under federal law, and many federal agencies require drug testing as a condition of employment. *See* Executive Order No. 12,564 § 3, 51 Fed. Reg. 32,889, 32,890 (Sept. 15, 1986), reprinted in 5 U.S.C. § 7301 note (authorizing "the head of each Executive agency" to "test any applicant for illegal drug use"). Because a reasonable juror could find that Hubbard did not sufficiently mitigate damages, the Court denies his motion for summary judgment as to the Navy's mitigation defense.

## IV.    CONCLUSION

For the foregoing reasons, the Navy's motion for summary judgment (Dkt. 16) is GRANTED IN PART AND DENIED in part as follows:

- The motion is GRANTED as to Hubbard's reasonable accommodation claim;

- The motion is DENIED as to Hubbard's disparate treatment claim for wrongful termination;

- The motion is GRANTED as to Hubbard's disparate treatment claim relating to Smith "berating" him;
- The motion is DENIED as to Hubbard's disparate treatment claim relating to his AWOL designation;
- The motion is GRANTED as to Hubbard's retaliation claim for his comments to Smith during their February 22nd argument and DENIED as to the remaining protected activities asserted for this claim; and
- The motion is GRANTED as to Hubbard's hostile work environment claim.

In addition, Hubbard's motion for partial summary judgment is GRANTED IN PART AND DENIED IN PART as follows:

- The motion is GRANTED as to the Navy's affirmative defenses for lack of subject matter jurisdiction, unavailability of punitive damages, and failure to exhaust administrative remedies; and
- The motion is DENIED as to the Navy's affirmative defense for failure to mitigate damages.

Dated this 10th day of July, 2024.

_____

Tiffany M. Cartwright
United States District Judge

ORDER ON MOTIONS FOR SUMMARY JUDGMENT - 30